Good morning, Your Honors. My name is Frank Morrella. I represent Ms. Bertha Rivera De Zavala in a case similar to this one, but not quite the same. Could you speak a little louder, please, for us? Yes, sorry. Thank you. There are several issues in this case, beginning with the issue of ineffective assistance of counsel, which eventually led to the admission of the allegations in the notice to appear. Second, we believe that there was a due process violation in requiring that an individual who changes or wants to change venue to another site bleed to the NTA. Didn't the BIA say that that wasn't the law? It's not the law, Your Honor, but it's the practice. Well, but in this case, what the BIA said, as I understand it, in their decision, is we're not going to rely on that. I understand. So that your client didn't suffer any damage from that in this case. Well, he did, because counsel, applying the regulations present in the court and the way the court behaves, did admit the allegations, which later on were due process. But the BIA later said, forget about that. We're not going to rely on those. Oh, very well. Then we'll stay on that issue. They tend to agree with you. All right. Thank you. Did the BIA err in applying the harmless error to the unauthorized use of the admissions? And I think the Court has answered that. And lastly, I think the issue has to do essentially with an issue very similar to the last one, and that was Ms. Zavala guilty of alien smuggling, and also did the judge in this case make credible findings? Yeah. Would you focus on the credibility findings and tell us why the adverse credibility finding is not supported by substantial evidence in your view? Well, let me begin by saying, Your Honor, that there are certain – the IJ in this case cited certain facts which are not found in the transcripts, are not found in the testimony before the Court. For instance, the judge made a factual determination that assumed that my client, Ms. Zavala, was part owner or the owner of the vehicle. The only information in which the allegation was made came from a second hearsay type statement made by the man who was driving the vehicle, whose name was Mr. Brandon, Claudio Brandon. Second, he – the judge assumed that the individual being smuggled was the niece of my client. Nowhere, anywhere does it appear that she was the niece of my client. Because he makes the argument saying, well, why doesn't Ms. Zavala know the name of the niece? She should know. But the PIA said that the niece mix-up issue was harmless. Well, fine. But still, the judge – the judge below used that as one of the facts to find that basically my client, Ms. Zavala, knew that the alien was there and that she had no papers. Well, the thing I was concerned about was she, at least in part, goes over there to pick up this woman and transport her. She asks the woman, do you have your documents? The woman hands her a passport and she looks at it and she says to the driver, this doesn't look like her. Right. And yet later she testifies that she didn't know that the woman was not documented until she was in secondary inspection. And the IJ thought that that was not credible. Correct. But – Why isn't that supported? Well, let me explain. Substantial evidence. The situation was this. She had the problem with her son. Her son, as soon as they parked to pick up this lady in a parking lot somewhere in Tijuana, they essentially – the son got arrested by the police for urinating in public. He later disappears from sight. She does not know where he's at. The police have grabbed him and sent him somewhere. Essentially, they beat him up. And he was found in a hospital some two hours plus later by the mother. The mother was upset. She wasn't able to buy the medicine. They did not go to her planned restaurant and visit by the beach and what they had planned to do. And they headed back home.  of the booth. She says, okay, let me see the documents. She had also done this with all the individuals that went with her, with Brandon, with her two kids and herself. She made sure that they all had documents before heading south from Huntington Beach to Tijuana. At that point, she says, okay, let me see all the documents. And among the documents was the passport by this lady. And she looks at it. They're in the car. It's nighttime. And despite the fact that it's nighttime, she says, that doesn't look like her, and goes towards Brandon. And Brandon says, no, that's her. Trust me, that's her. One of the officers. I didn't see. Was that testimony in the record? Yes, Your Honor, it was. Yeah. Brandon supposedly says to her, yes, that is her. Don't worry. Or says she's legal. Right. Right. And that passport was a U.S. passport. Okay. So the presumption is that she's a U.S. passport. Now, she had also asked her husband before leaving from Huntington Beach, is this person legal? And the husband says, yes, she's a U.S. citizen. She testified that she was told that by her husband before going. So unlike a number of cases that we see, this is a case where the petitioner says, I know I was going to – part of my plan in going to Mexico was to drive back somebody. And I think it's a friend of her husband's niece. Right. Correct. I'm going to pick her up and drive her back. So it's not – and the husband says to her before you go across the border, she's legal. Well, no, Your Honor. Right. Right. The husband says, petitioner did not know the person, but she agreed to pick her up, AR-201. She asked her husband if her friend had legal documentation on her, and the petitioner's husband told her she was a United States citizen. Correct. Okay. I just want to walk through the facts. I'm not fighting right here. I want to make sure I understand them. She gets across the border. For whatever reason, the person enters the car. She says on the way, I asked to look at her documentation, and it didn't look good to me. I agree. The picture doesn't look like the person. And then she asks, and then somebody else in the car reassures her, according to this record. Now, let's assume that in looking at the picture, it was my picture. Would that be enough? To assume that she was smuggling an alien? Yeah. I believe so, if you, in fact, were supposed to be the niece, and you're supposed to be herself, Your Honor. Do we have in the record the actual? No. You know, those documents are seized by the government, and they were never produced. No, I'm just asking. We don't have the actual passport in the record. The government did not produce the passport. I have another question about the credibility. The immigration judge gave two big reasons, and then maybe some additional smaller reasons for not believing your client. Then the BIA talks about the immigration judge's decision, but it actually gives two of its own reasons, which are different than the reasons that the immigration judge gave. So my question to you is this. Do you read the BIA's decision as replacement? That is, well, the immigration judge had his or her reasons. I can't remember at the moment. But we have different reasons. These are ours, so we're only reviewing the BIA, or were these extra reasons so that we are reviewing both sets of reasons? I believe the BIA tried to play that situation in basically the BIA. The second part of my question? Yes. I'm looking at your gestures. So you think that we're reviewing both because the BIA was sweeping it all in? I feel that the BIA, finding some faults with the IJ's reasoning, the IJ's interpretation of the facts, did incorporate in the opinion some subtle hints that the judge should have also relied on other things, but essentially relied on the IJ's opinion. And I repeat, the opinion is faulty in that the judge relied on facts which were not there. The only information they got from Mr. Brandon was on a second or third hearsay type of information from the I-213, basically saying I believe the car was owned by Ms. Zavala. I'm not sure who owns the car in this case is an important issue, because everybody agrees that she goes across the border with the intention, among other things, to bring back this person. Right. So who owns the car is not terribly important to me. The critical fact is what she knows about the citizenship of this person when she brings her – when they come across. Your Honor, the IJ used that as one of the facts. Well, and I'm saying for me it's not particularly persuasive. No, I agree. Because she admits in advance – everybody knows in advance that she's going across whether she owns the car or not with the intention of bringing this person back. Additionally, the IJ says she could not come because she had – she was infirmed she could not drive. That's not true. The reason she did not drive is because her car was being repaired. That is something that was totally neglected by the IJ. Can I – can we get back to the question Judge Graber asked you about credibility? So in this case, this case entirely turns, it seems to me, on what your client knew when she was coming across the border. Do you agree? At that point when she was feet away from primary, yes. In other words, if she knew for – she knew for certain that this person was not an American citizen, then she's inadmissible. I don't think you can make that argument, Your Honor, simply because she looked at this picture. The conditions were dark. She was inside of a vehicle driving, inching away to, I suppose, it's not in the transfer, but slowly going towards primary. And she sees this photo. And remember, Your Honor, this person, my client, Ms. Zavala, had had the experience two years prior when she was coming with her nephew and her sister who had cancer. And she tried, effectively, that one time. She tried to smoke. Let me ask you again about the records so that I'm clear. Was the passport of the undocumented entrant in front of the IJ? No, Your Honor. Not there at all? No, Your Honor. So the IJ couldn't have said, well, I don't believe you because anybody looking at this would have reached a different conclusion. I don't recall, Your Honor, there even being a picture. Was there testimony on that? Forgive me, Your Honor. Was there testimony from the officers about the photos? No, Your Honor. There was testimony asked from the primary officer about handing the documents, but no description. I thought there was some testimony that the photos didn't look the same, and that's why they were over to secondary. Yes, but they didn't go into detail. They simply said it was certain. As a matter of fact, the referral to secondary were not made on the basis of fraud, but it was made on the basis of status. And so, you know, even the primary officer did not see this as a fraud case. It saw it as a status whether this person had, in fact, a U.S. passport. And that is also one of the keys is to the perceptions of the officer at the moment that they came to the border. If that is the questions I have, I will reserve for rebuttal. You may do that. Thank you, Your Honor. May it please the Court. Jeffrey Lee is appearing on behalf of the Attorney General. In this case, as in the previous case, substantial evidence supports the agency's determination that the petitioner engaged in egging and smuggling. The Court has been focusing on the adverse credibility finding, and I think that is supported by substantial evidence here. What if it isn't? If she legitimately believed that this person was a United States citizen, what – where do we stand then? Well, if I can challenge that for a second, Your Honor. She told the immigration inspector that she knew the person was not entitled to come – or she believed the person was not entitled to come into the United States. Well, I know. You're fighting the question. I'd like to – but it's important to me to know the answer to it. Sure. I'm going to take it away even from this petitioner. If someone brings a person, whether they know them or not, across the border, and they genuinely believe that the person is a United States citizen, they maybe – maybe they wonder about it, but they don't know to the contrary. Are they guilty of a crime or anything? I mean, what's illegal? In order to be found guilty or to be found immovable, you have to knowingly engage. So it takes away the knowing. Right. So if you legitimately have no idea. Or if you just have a doubt, but it's just kind of a nagging doubt. Right. Gee, it's funny that they're a citizen because I didn't know that, or it seems – One point on that is that in Altamirano, the court cites with approval Sanchez Marquez in the Seventh Circuit. In that case, the alien didn't have absolute knowledge that the aliens were illegal. I'm not sure if you're familiar with the case, but it was – the guy had gone to Mexico, had met some people, said, hey, if I meet you on this side of the border, the U.S. side of the border, I'll drive you to San Antonio. And the court in the Seventh Circuit at least said that that was sufficient to induce people that – why would these people have to come to the United States before you pick them up? What was – But that's different than the other scenario. If you're in Mexico and someone that you believe is a United States citizen asks for a ride, you can give them a ride without committing a crime. Correct. However, if you have knowledge – Okay. So the question is, and I think Judge Graber tried to ask it before. I'm not sure we've gotten an answer to it today yet. Can the adverse credibility finding establish knowledge? In other words, this is a case where, as I understand it, Ms. Rivera says, hear the facts. Right. I went across – this was a friend of my husband's niece. The IJ gets that wrong. I knew I was going to pick her up and bring her back. My husband assured me she was okay. On the way in, I asked to look at her papers, and they didn't look terrific to me. I expressed some doubt about them, and somebody else in the car said, don't worry, she's a citizen. That's – those are the facts. Those are the facts from her. Right. Now, why – can the government meet its burden of establishing grounds for inadmissibility by clearing convincing evidence simply because the IJ says, though you say those are the facts, but I don't believe you? In other words, how does the IJ's lack of belief in her story establish knowledge? Well, because there's evidence in the documentary evidence that contradicts her claim. Officer Greger, who was one of the inspecting officers, he presented a report, and this is at page 476 of the record. He says that the Petitioner – Well, that's – okay, and I want to get to that, but that's substantial evidence. My question is the same one I think, I hope, that Judge Craver was trying to ask before, which is that can your – can the IJ's lack of belief in the credibility of the Petitioner in this case establish the clear and convincing evidence that the government has to present for removal? I think it depends on what the basis is. I think that if the immigration judge were just to say, you know what, I don't believe you, that might be a difficult issue. I think if the immigration judge says, I don't believe your story because the record shows this, this, and this, and this, then yes. Well, but then it's the lack of belief. It's not the lack of belief that establishes it, but I'm sorry, Judge Kuter, but the rest of the record. Yeah, taking out – just following up on Judge Hurwitz's question. Sure. Taking out her testimony, was there – did the government present clear and convincing evidence that she was knowingly engaged in smuggling? And if so, what was it? I believe that they did, Your Honor. And it was this investigative report by Officer Greger. He was one of the inspecting officers when they got put in secondary inspection. And he, in page 476 of the record, says that the Petitioner told to him that she saw the alien's passport and could tell it was not the alien's and that she believed the alien was a citizen of Mexico with no legal entry documents. Officer Greger testified at the hearing and said, yes, that's what she told me. So here it's not simply the immigration judge saying, I don't believe you. It's saying, well, the record says this. You say this. I don't believe your story. I believe the record's story. Can I ask you a very different question than the ones we've been asking so far? Feel free. Why is this an inadmissibility case as opposed to a removal case? Because she was attempting to seek admission to the United States. She had gone abroad. And because of the illegal acts committed in Mexico, it's an inadmissibility versus a removability case. What illegal act did she commit in Mexico? It was the alien smuggling. Is that an illegal act in Mexico or was that an illegal act in the United States? Did she commit any illegal act before the papers were presented? Well, it's – smuggling cases are not one-and-done issues. And what I mean by that, it's an ongoing process. Let me tell you why I'm asking the question, just so I'm not hiding the ball on you. In inadmissibility cases, we have a statute that says permanent residents are not treated as seeking admission. Right. Except if they've engaged in illegal activity after departing the country. Right. And I assume you read it the same way as I do, that the illegal activity must occur outside the country. Right. Yes. Because then if it was just temporal, after departing, it would mean even if they came back. Right. I mean, that's why it's inadmissibility, because it's basically preventing you from being admitted. Okay. But U.S. versus PSY. So what's the illegal activity here? It's the alien smuggling. And is that illegal – what statute makes that illegal? Well, I think U.S. versus PSY talks about this, that under 1324. Right. It's an illegal – it's a criminal act. Right. So you have to prove a violation of a criminal statute. Right. Well, I don't think you even have to do that, because illegal is different from criminal. There's different – there's broadness issues, but it doesn't necessarily have to be a criminal act. So, again, I'm just focusing on when the criminal act occurs. If it occurs on United States territory, is that a legal activity after departing the country? I'd understand why it would be grounds for removal. Right. Exactly the same statutes, but that's not the route the government chose here. I mean, in U.S. versus PSY, the court held that that was acceptable, that the illegal entry – or the illegal smuggling was the basis for the inadmissibility issue. So that you can be charged with inadmissibility, and that basis can be something that happened abroad, which in that case was the smuggling. So the efforts, wherever the person is, the efforts of that person to bring an alien illegally into the United States could be – could make that alien inadmissible. Is that correct? I believe so, Your Honor. And then I was a little confused about this illegal activity issue. But Gonzaga-Ortega suggests that the immigration officer can make this decision on the fly. Is that correct? I believe that's what the court held in that case, yes, Your Honor. So the I.J. doesn't have to – so who adjudicates that this activity is a legal activity? Is it the I.J. who does it? The I.J. – well, the initial officers at the border make the determination, and that's what puts the alien in proceedings. The immigration judge then decides whether or not substantial evidence supports that charge. But the officers are the initial ones who are saying this person is, you know, seeking admission. They've committed an illegal act. And then it goes to the immigration judge, where then it will be decided by the immigration judge. Okay. And just as a technical matter, what happens to the entrant? She's admitted conditionally? I believe that she was paroled into the United States. So if there's no further questions, thank you. Thank you. Mr. Morrell, you have a couple of minutes remaining. Thank you, Your Honor. I think to answer the Court's question as to the evidence regarding admissibility, that is, when you're coming into the country and you're treated as an applicant for entry, if you're an LPR, of course, you have the section that says, unless you're coming in with an illegal activity abroad, we're going to treat you as not having made an entry or not having been admitted. You simply can come in. But it's not the decision of the officer on the spot, on primary or secondary, to make that determination. He can detain that individual and then set him for removal of proceedings, type out, issue an notice to appear, and then he goes in front of an immigration judge. What about Gonzaga Ortega? I mean, that case suggested that the immigration officer is, in fact, entitled to make that determination. I believe in the initial determination to make the arrest and to make the detention, the Court is correct. But then it has to go in front of an immigration judge, where the immigration judge would look at this case with clear and convincing evidence that the individual engaged in illegal activity in the United States. Well, the government, in fact, undertook that with the notice to appear and going through the hearing in this case. Right. So whether they had to or not, they actually did follow the procedure of taking it to the immigration judge and so on and so forth. Correct. And it's the immigration judge who then makes the decision to treat this as a under 212A, as opposed to under 237, the deportation versus exclusion statute. And it is at that point in which the Respondent either retains or loses some of the rights that he has in the Constitution, which are not as good, as the Court well knows, in an exclusion case as opposed to a deportation case. Can you deal with the issue raised by counsel for the government, the part of the record where AR 476 I think he's talking about? Can you tell me why that doesn't supply sufficient evidence in this case? Which document is that, Your Honor? The Greger report? Yes, the report from the ---- It starts at page 474. 474 through 476. In particular, page 476. I don't have the record with me, Your Honor. But this is the record from Officer Greger, I think? Yes. Yes. Well, Officer Greger essentially was the officer at secondary. And the officer at secondary, and again, my client, Ms. Zavala, was so preoccupied with the issue of not bringing any undocumented people to the United States because of her past experience, that she told him, look, I looked at this document and it didn't appear to me it was real. But I was assured, essentially I was assured that it was. I guess I'm asking, is her statement to Officer Greger different than her, different than what she says during the hearing? I believe it's the same information, Your Honor, if I recall correctly. What she told Officer Greger. I think the difference is that the Greger report doesn't contain the reassurance from someone. At least as I read it. Right. Well, I think she reiterated that she was assured by Mr. Brandon that she was, in fact, a citizen. Well, it doesn't. The Greger report said Brandon didn't comment about if he thought Marino was illegal, which is different. I mean, that's the subtle difference, I guess. Didn't comment to him. Well, that's an interesting question, whether he means to Greger or to Rivera. So I don't think that the burden was met by clear and convincing evidence, Your Honor. That's basically, I believe, the only conclusion that can be arrived at in this case. Thank you, counsel. Thank you, Your Honor. We appreciate the arguments of both counsel. The case is submitted.
judges: Graber, Ikuta, Hurwitz